**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**

**UNITED STATES OF AMERICA,**
***Plaintiff***

**vs.** **Case No. 24-CR-20070-5-DDC**

**LAWRENCE McMANAMON,**
***Defendant***

**Pursuant to Fed. R. Crim. P. 29**

**DEFENDANT LARRY McMANAMON'S REPLY IN SUPPORT OF MOTION FOR JUDGMENT OF ACQUITTAL UNDER FED. R. CRIM. P. 29**

Defendant, Larry McManamon, by and through undersigned counsel, submits this reply in support of his Motion for Judgment of Acquittal under Fed. R. Crim. P. 29 (Docs. 408 & 416) and his Supplemental Brief in support of that motion (Doc. 488). The government filed its response in opposition on July 27, 2026 (Doc. 502).

## Introduction

The government's response disregards the analysis this court issued two weeks earlier addressing the insufficiency of the government's proof regarding the international travel allegations. On July 14, 2026, the court entered a Memorandum Opinion granting Mr. McManamon's Rule 29 motion on Count 1 and explaining, on the international travel record, why no rational juror could find beyond a reasonable doubt that Mr. McManamon joined the alleged criminal conspiracy to steal IBB funds by engaging in assigned international travel. Doc. 494. The government's response to the reserved Rule 29 motion does not engage that opinion. The

government cites it once, in passing, and then argues the international travel record as if the court were reviewing it for the first time. Doc. 502 at 16-18. That approach is a curious one.

The court has now reviewed this record three times: pretrial under Rule 801(d)(2)(E), Doc. 340; at trial under the same rule at the close of the government's case, Tr. 3476:7-3480:3 (Vol. 15 - May 22, 2026); and again under Rule 29 on Count 1, Doc. 494. Each review has reached the same conclusion: the government's evidence, taken as true and viewed in the light most favorable to the government, does not establish Mr. McManamon's criminal intent connected to his assigned international travel.

The government's response offers nothing that can change the outcome of any of those three reviews. It repeats the same trip-attendance evidence the court has already found insufficient. It invokes the jury verdict as if it was a substitute for legally sufficient proof – even though under Rule 29(b), the verdict is not part of the inquiry. It misreads *Freeman* as authorizing a jury to reach the opposite legal conclusion on the same accepted facts – a divergence *Freeman* does not sanction. And it treats the court's Rule 29 grant on Count 1 as if it turned on a technical feature of RICO – even though the court's reasoning rested on the general *Goldesberry* equipoise rule that applies to every sufficiency review of every element of every crime.

Our reply is in five parts. Rule 29(b) fixes the inquiry to the government's case-in-chief record (Part I). The court's Memorandum Opinion has already answered the mens rea question on that record (Part II). The split verdict cannot substitute for proof the government did not muster (Part III). The government's arguments regarding spillover are wide of the mark (Part IV). Lastly, we offer count-by-count observations on Counts 11, 20 and 21 (Part V).

## I. Rule 29(b) fixes the inquiry to the government's case-in-chief record; the verdict is not part of the analysis.

The government's response repeatedly invokes jury deference. It writes that the court "must consider the evidence in the light most favorable to the government," Doc. 502 at 2, that the court may not "weigh conflicting evidence nor consider the credibility of witnesses," *id.*, and that a "discerning verdict" is "strong evidence that no spillover prejudice occurred," *id.* at 6. But those principles attach only to a Rule 29 review conducted after a verdict on the full trial record. This is not that motion.

Rule 29(b) is explicit: "If the court reserves decision, it must decide the motion on the basis of the evidence at the time the ruling was reserved." Fed. R. Crim. P. 29(b). This court reserved decision on the substantive counts at the close of the government's case on May 28, 2026. Tr. 4091:5-15 (Vol. 18 - May 28, 2026). The only evidence relevant to this motion is therefore the government's case-in-chief as it stood on May 22, 2026 – not the defense case, not the verdict, and not any inference the verdict may be said to embody. The government's response never confronts that limitation. It treats the verdict as evidence, arguing the jury's split verdict plugs holes in a trial record the court has already found insufficient. It cannot and it does not.

On this record, at this stage, the question is a legal one: "whether the government's evidence, credited as true, suffices to establish the elements of the crime." Doc. 494 at 4 (quoting *United States v. Johnson*, 821 F.3d 1194, 1201 (10th Cir. 2016)). The court has now applied that test to this record three times. Its answer has been the same each time.

## II. The court's July 14, 2026 Memorandum Opinion has already answered the mens rea question on this record.

The Memorandum Opinion (Doc. 494) contains a detailed sufficiency analysis of every category of evidence the government offered to prove Mr. McManamon's criminal intent with

respect to the international travel that underlies Counts 11, 20, and 21. Four features of that opinion are dispositive here.

**A. The court credited every government witness. *Freeman* does not authorize a jury to reach the opposite legal conclusion on the same accepted facts.**

The *Freeman/Pitocchelli* framework the court referenced on May 22 identifies the narrow circumstance in which a jury's guilty verdict may rationally diverge from a judge's insufficiency finding on the same evidence: where the court's finding rests on "its own inferences and credibility assessments" that the jury could rationally view differently. *United States v. Freeman*, 208 F.3d 332, 343 (1st Cir. 2000). *Freeman* is a credibility-divergence framework. It presupposes that the judge disbelieved a witness the jury could rationally have believed.

That mechanism is absent here. The Memorandum Opinion accepts every government witness as credible and then analyzes what their accepted testimony proves. On the international travel, the court accepted: Simmons and Brown, that an IEC member "must attend" when the International President assigns a trip, Doc. 494 at 7; Fairley, Martin, and Stapp, that Mr. McManamon "faithfully and diligent[ly] work[ed]" during the trips, *id.*; Stapp, that Mr. McManamon was "on business calls, all day long, during these trips," *id.* On the vacation payout, the court accepted Brown and Goodwin's testimony that President Jones directed the 2015 policy not be implemented. *Id.* at 12. On Article 17, the court accepted the government's evidence about the alternative committee's composition and output. *Id.* at 15-16.

Working from that accepted evidence, the court concluded: "the government's evidence, credited as true," does not "suffice[] to establish the elements of the crime" on Count 1. *Id.* at 4. That is precisely the finding *Freeman* does not authorize a jury to overturn. *Freeman*, 208 F.3d at 343 (jury may diverge based on a different view of inferences and credibility assessments, not on the

same accepted facts). Where the judge accepts the government's witnesses as credible and holds the evidence legally insufficient on those accepted facts, the jury is not free to reach a different legal conclusion.

The government's response elides the credibility premise on which *Freeman* rests. It quotes *Freeman* for the proposition that a court's evidentiary ruling "does not preclude it from concluding that the jury might view the evidence differently." Doc. 502 at 16. True – where "view[ing] the evidence differently" means weighing credibility differently. That is not what happened here, and it is not what the government's response argues happened. The response argues that the same accepted evidence supports a different legal conclusion: that mere attendance at assigned trips is sufficient proof of willful embezzlement. *Freeman* does not sanction such a result. And the government does not identify a single case in which a court, having credited the government's witnesses and having held their accepted testimony legally insufficient, has then allowed a jury verdict on the same evidence to stand.

**B. The July 14, 2026 Memorandum Opinion's mens rea reasoning tracks the § 501(c) mens rea inquiry.**

The court granted Rule 29 on Count 1 on two independent grounds – element 2 (membership with knowledge of purpose) and element 4 (interdependence). Doc. 494 at 6, 17. The government's response focuses on element 4 and argues *Caldwell*'s mere-presence rule is "specifically linked to whether the government had proven the 'interdependence' element of a conspiracy." Doc. 502 at 17. That characterization does not fit the Memorandum Opinion, and the argument would not carry the day even if it did.

First, the mere-presence and equally-reasonable-inference analysis in the Memorandum Opinion appears in the membership discussion – element 2 – well before the interdependence

discussion. Doc. 494 at 6-11. On membership, the court held: "All the evidence indicates is that Mr. McManamon attended the trips assigned to him and completed the work he was assigned while he attended. He was merely present – which doesn't suffice to establish membership in the conspiracy." *Id.* at 8. And: "[i]t is 'equally reasonable' to infer that he went on the trips because his boss told him to go." *Id.* That is a finding about criminal mens rea – knowledge that a joined venture had a conspiratorial purpose – on the international travel record.

Second, the § 501(c) elements demand at least the same, and in relevant respects a higher, showing of criminal intent than element 2 of Count 1. The court instructed the jury that § 501(c) willfulness requires "the specific intent to do something the law forbids, with knowledge that it is prohibited by law, and with bad purpose to disobey or disregard the law." Jury Instr. No. 17. It further instructed that a defendant "does not act with fraudulent intent if the defendant had a good-faith belief that (1) the expenditure was being used for the benefit of the IBB, and (2) the IBB had authorized the expenditure or would authorize it." Jury Instr. No. 29. If mere attendance at an assigned trip does not establish knowledge of a conspiratorial purpose (element 2 of Count 1), mere attendance at an assigned trip a fortiori does not establish specific intent to disobey the law and the absence of a good-faith belief that the trip was authorized.

Third, the controlling rule Doc. 494 applies is not confined to an analysis of the sufficiency of conspiracy evidence. The Memorandum Opinion is based on the Tenth Circuit's general sufficiency-of-the-evidence doctrine: "An inference is unreasonable if it requires the jury to engage in a degree of speculation and conjecture that renders its findings a guess or mere possibility," and "[s]peculation and conjecture occur when a reasonable fact-finder is left with a number of equally reasonable inferences." Doc. 494 at 5 (quoting *United States v. Goldesberry*, 128 F.4th 1183, 1192, 1195 n.7 (10th Cir. 2025)). Applying that rule to the international travel, the court found the record

– at best – in equipoise as to Mr. McManamon's intent: "Where the evidence sits in equipoise – after viewing the evidence and inferences from it in the government's favor – no conviction may follow because under these circumstances a reasonable jury must necessarily entertain a reasonable doubt." *Id.* at 11 (quoting *Goldesberry*, 128 F.4th at 1193) (emphasis in original).

The equipoise rule relied on by the court in concluding Count 1 mens rea evidence was insufficient is a general rule that applies not just to the conspiracy allegations, but also to the analysis of the sufficiency of the mens rea evidence regarding international travel. This court cannot rationally conclude that the same international travel record that puts the government's evidence of intent in equipoise as to Count 1, is somehow sufficient to prove § 501(c) willfulness beyond a reasonable doubt regarding that same international travel.

### C. Document 494 specifically rejected the "trips lacked union benefit" theory the government revives here.

The government's response returns, at length, to the theory that Brown and Fairley described the FLAEI trips as lacking union benefit, and that Brown described the TSSA meetings as brief, so the jury could infer criminal willfulness from Mr. McManamon's attendance. Doc. 502 at 10-16. The court has already addressed that theory:

> “The government makes much of the trips' allegedly insufficient IBB purposes. In their Rule 29 oral argument, for instance, the government contended that repeated trips to Italy to meet with designees from an Italian union didn't further the union's interests. But the government never adduced any evidence that Mr. McManamon had any hand in determining which trips President Jones should assign – or when or to whom. What's more, the government never adduced any evidence that Mr. McManamon took a trip on IBB's dime that was unassigned by the IBB's president. All the evidence indicates is that Mr. McManamon attended the trips assigned to him and completed the work he was assigned while he attended. He was merely present – which doesn't suffice to establish membership in the conspiracy.”

Doc. 494 at 8. The government's response offers no new theory and no new evidence. It offers the same theory the court just rejected, on the same evidence the court has repeatedly analyzed. That the government has repackaged the argument under the heading "Embezzlement" rather than "RICO Conspiracy" does not change the underlying record – or the answer.

Worse, on Counts 11 and 21, the government's own exhibits and witness testimony affirmatively rebut the "lacked union benefit" theory. The Transport Salaried Staffs' Association Strategic Partnership Agreement – the deliverable of the TSSA engagement – was signed on the union's behalf and is admitted as Exhibit 116. Brown, the government's witness, testified on cross-examination that the TSSA initiative was his to advance: "we wouldn't be here talking about TSSA if it wasn't for [him]." Tr. 1583:23 (Vol. 8 - May 13, 2026). And the government's own case agent acknowledged that other IVPs (Stadnick, Fultz, Baca) attended the same kinds of trips and remain uncharged. Tr. 2854:25 (Vol. 12 - May 19, 2026).

For Count 20 (FLAEI 2022), the same defect. The government asks the court to infer willfulness from an itinerary that included "open" days, "tour" days, and a Solano Dock boat trip circulated by Ms. Rose. Doc. 502 at 8-9. That evidence, at most, describes the itinerary of the delegation. It is not evidence about what Mr. McManamon did with those days. The government identifies no premium excursion, no personal expense attributable to Mr. McManamon, no reimbursement request containing a false statement, and no conversation in which Mr. McManamon expressed knowledge that the trip was improper. The court has already held that this kind of "impression evidence" from cooperators about what the delegation did together does not carry the government's burden on this record. Doc. 494 at 10 ("the evidence about almost all of those trips merely put Mr. McManamon at the scene – having received an assignment from his boss to attend – with no indication of extra-business activity").

### D. The government's Caldwell-is-a-RICO-rule argument misreads the Memorandum Opinion.

The government's central legal argument on the *Freeman/Pitocchelli* question is that *Caldwell*'s mere-presence-or-association rule is a conspiracy-specific rule, tied to the interdependence element, and therefore inapposite to the substantive embezzlement counts. Doc. 502 at 17. That argument does not survive contact with the Memorandum Opinion or with Tenth Circuit doctrine.

As already discussed, the Memorandum Opinion applies mere-presence reasoning to element 2 of the RICO conspiracy – the membership element that turns on the defendant's knowledge of a conspiratorial purpose. Doc. 494 at 6-11. The rule the court applied there is the same rule *Caldwell* articulated at 589 F.3d at 1329: "[M]ere presence is not sufficient in and of itself, nor is it sufficient for the government to show only mere association with conspirators known to be involved in crime." That rule addresses what mere attendance can and cannot show about a defendant's state of mind. It is not a conspiracy-only rule; the Tenth Circuit and other Circuits routinely apply the same reasoning to substantive intent inquiries. See, e.g., *United States v. Valadez-Gallegos*, 162 F.3d 1256, 1262 (10th Cir. 1998) (rejecting conviction that rested on "piling inference upon inference" including presence with wrongdoers).

And, as also already discussed, the decisive rule Doc. 494 applies at each analytical step is *Goldesberry* equipoise. Doc. 494 at 5, 10, 13, 15-16. That rule is not a conspiracy-specific doctrine. It governs any circumstantial inference that may be drawn regarding any element of any criminal offense. The government's response does not address *Goldesberry*. It does not address equipoise. It does not address *Dewberry*'s rule against "piling inference upon inference," 790 F.3d 1022, 1028 (10th Cir. 2015) on which the Memorandum Opinion also relies. Doc. 494 at 4, 10. Yet Doc. 494

rests centrally on each of these authorities, and each applies with equal force to the § 501(c) mens rea inquiry the jury undertook on Counts 11, 20, and 21.

## III. The split verdict does not rescue the government's proof on Counts 11, 20, and 21.

The government's response leans heavily on the fact that the jury acquitted Mr. McManamon on Counts 10 and 16 but convicted him on Counts 11, 20, and 21. Doc. 502 at 6-7. It argues that the jury "appeared persuaded" by the government's trial argument dividing the trips into UN climate conferences (acquitted) and TSSA/FLAEI trips (convicted), citing "one union employee" who testified about legitimate reasons to attend the UN Climate Change Conference. *Id.* at 7. Two responses.

First, the split verdict is not part of this Rule 29(b) analysis at all. Fed. R. Crim. P. 29(b) (motion decided "on the basis of the evidence at the time the ruling was reserved"). The government has not identified any authority for using a post-reservation jury verdict to rehabilitate a pre-reservation record. There is none.

Second, even setting Rule 29(b) aside, *Powell*'s independent-sufficiency rule requires the court to test the evidence on Counts 11, 20, and 21 without giving the government the benefit of any acquittal-based inference. *United States v. Powell*, 469 U.S. 57, 67, 105 S.Ct. 471 (1984). And on that independent test, the government's trip-category distinction collapses on its own witnesses and exhibits:

TSSA Counts (11 and 21). The TSSA engagement produced a signed Strategic Partnership Agreement (Ex. 116) on the union's behalf. That is the substantive deliverable of the trip. Brown – the government's cooperator – testified that the initiative was his own. Tr. 1583:23 (Vol. 8 - May 13, 2026). Fairley, on the union's behalf, signed the agreement. Doc. 488 at 20. The 125th-anniversary meetings (Count 21) were a continuation of the same engagement. Nothing about that

record is meaningfully distinguishable from the record on Count 10 (Madrid/COP25), on which the jury acquitted, or Count 16 (COP26/Glasgow), on which the jury also acquitted – trips the court itself found had at least "a significant union purpose." Tr. 3477:19-25 (Vol. 15 - May 22, 2026). If a signed international partnership agreement is not a stronger showing of union purpose than attendance at a UN climate conference, the government has yet to explain why.

<u>FLAEI Count (20)</u>. The FLAEI Convention was a real event. The itinerary is in evidence as Exhibit 320i. The assignment letter is in evidence as Exhibit 320a. Ms. Stapp's February e-mail to Mr. McManamon (Ex. 320q) placed him on the assignment. The government identifies no personal expense attributable to Mr. McManamon that is not a documented hotel or meal receipt for a stay within the FLAEI travel window. Its own count-specific summary, Ex. 320b, reflects that Mr. McManamon accounted for approximately $10,826 of an approximately $258,807 total spend – about four percent. If the group included travelers whose union role was minimal (Doc. 502 at 9), that is not evidence about Mr. McManamon's intent. It is evidence about President Jones's assignment decisions – which, as the court has already held, cannot be attributed to Mr. McManamon. Doc. 494 at 8.

The government cites Tr. 1051:7-22 and 1052:1-8 for the point that a union employee testified there was a legitimate reason to attend UN climate conferences. Doc. 502 at 7. That is true. But the point cuts against the government, not for it. The trial record contains equally clear testimony that the union had legitimate reasons to engage with TSSA (Brown, Fairley) and FLAEI (Brown, Fairley), and admitted documentary exhibits showing what those engagements produced (Ex. 116 for TSSA; Ex. 320i for the FLAEI Convention). "Legitimate reason" evidence on the acquitted counts is not evidence of criminal intent on the convicted ones. If the presence of one union employee testifying to legitimate purpose is enough to distinguish the acquitted counts, the

presence of the government's cooperators testifying to the reality of the TSSA partnership and the FLAEI convention should be more than enough to preserve the same treatment for the convicted ones.

*Powell* does not preclude relief; it requires the court to look past the jury's inconsistency and ask whether the evidence on the convicted counts, alone, would sustain the verdicts. On this record, applied through Doc. 494's mens rea framework, it does not.

## IV. The government's response to the spillover argument is wide of the mark.

### A. The government's severance argument is disingenuous.

The government argues that Mr. McManamon "waived" any spillover objection because he did not move to sever under Rule 14(a) pretrial, citing *United States v. Woods*, 210 F.3d 70, 78-79 (1st Cir. 2000). Doc. 502 at 4-5. Two responses. First, *Woods* is inapposite. It addresses an appellate challenge to the denial of severance – a claim for relief separate from Rule 29 sufficiency review. The spillover discussion in Mr. McManamon's brief is not a renewed Rule 14(a) severance motion; it is a diagnostic explanation for why the split verdict is not a substitute for the legally sufficient proof Rule 29(b) requires. See McManamon Supp. Brief (Doc. 488) at 5-8. Nothing in *Woods* speaks to Rule 29 review.

Second – and more to the point – the government is not well-positioned to accuse Mr. McManamon of waiving anything on severance. After this court issued its pretrial James Memorandum and Order finding that "the evidence proffered about defendant McManamon constitutes no more than mere presence," Memorandum and Order (Doc. 340) at 10, Mr. McManamon moved to dismiss Count 1 as to him.[1] McManamon's Motion to Dismiss Count One

[1] We also asked the government to dismiss Count 1 in a call after the James ruling. The logic underlying the request was straight-forward: based on the extensive discovery, we knew the government had no trial

(Doc. 346). That motion warned that keeping Mr. McManamon in Count 1 through trial would produce exactly the spillover the government now insists Mr. McManamon has waived the right to challenge: "Washing off the spillover effect of the weeks of evidence presented against his co-defendants that is not relevant to the six counts against him, clearing the confusion over coconspirator statements that are relevant and admissible as to his co-defendants but not as to him, and unringing the bell of having been repeatedly called a racketeering coconspirator by the government for the entirety of the government's case will all be, in a word, impossible." Doc. 346 at 6. The government opposed dismissal. United States' Response in Opposition (Doc. 352). Mr. McManamon renewed the motion orally at trial on May 22, 2026, after the government rested; the government opposed dismissal again. Government's Opposition to Defendant's Third Motion to Dismiss (Doc. 423).

The decision to keep Mr. McManamon in Count 1 was made by a well-prepared government team that presumably knew its trial evidence against Mr. McManamon would not differ in any meaningful way from the insufficient evidence summarized at the *James* hearing. It was this decision that foreclosed any possibility of severance. It was this decision that created the trial posture where the spillover effect was rampant. The government cannot force a defendant to stand trial as an alleged racketeering conspirator on legally insufficient evidence and then argue that his failure to seek severance from the very trial the government insisted on extinguishes his right to point out, on Rule 29, that the trial produced impermissible spillover.

The independent Rule 29 point stands on its own. The trial record, taken as a whole, included weeks of evidence – much of it wholly outside the coconspirator-hearsay framework

evidence beyond that which the court had found legally insufficient, so dismissal was called for. The government declined.

covered by the court's limiting instructions – about a fourteen-year alleged RICO enterprise, wage embezzlement, Bank of Labor fraud, health-care fraud, pension fraud, and vacation-pay embezzlement. Doc. 488 at 6. That evidence had no proper application to Counts 11, 20, and 21. Its presence in the trial explains what the verdict cannot substitute for on Rule 29(b): actual, count-specific proof of willfulness and fraudulent intent on the three trips of conviction. See *Kotteakos v. United States*, 328 U.S. 750, 774, 66 S.Ct. 1239 (1946) ("transference of guilt" risk); *Bruton v. United States*, 391 U.S. 123, 135, 88 S.Ct. 1620 (1968) ("the practical and human limitations of the jury system cannot be ignored").

### B. The government cannot use *Freeman* both ways.

The government's response makes two *Freeman* arguments that cannot coexist. On page 6, citing *Freeman*, the government argues that the jury's split verdict is "strong evidence that no spillover prejudice occurred" because it shows the jury followed the court's limiting instructions and "distinguished between different charges." Doc. 502 at 6. On pages 16-17, again citing *Freeman*, the government argues that the jury was free to reach a different conclusion from the court's Rule 29 finding on Count 1 because a trial court's evaluation of the evidence does not preclude a jury from viewing that evidence differently. *Id.* at 16.

Those two arguments cannot both be right. Either the jury followed the court's instructions (including the coconspirator-hearsay limiting instructions the government invokes on page 6), and drew a discerning verdict distinguishing the record on each count – in which case the split verdict is evidence about instruction-following and cannot double as a rational divergence from the court's insufficiency findings on the same evidence – or the jury reached a different legal conclusion on the same evidence, in which case *Freeman* would demand a credibility-based explanation, and none

exists on this record. *Freeman* authorizes the first phenomenon and does not authorize the second. 208 F.3d at 342-43.

### C. Limiting instructions could not cure the mass of non-hearsay evidence about other counts and other defendants.

The government's response emphasizes that the court repeatedly instructed the jury that coconspirator statements could be considered against Newton Jones and William Creeden (and later, Kateryna Jones) but not against Mr. McManamon. Doc. 502 at 5-6 (quoting the court's limiting instruction and Jury Instruction 44). That is accurate as far as it goes. But the limiting instructions the government cites addressed one category of evidence: coconspirator statements admitted under Rule 801(d)(2)(E). The government did not – and could not – address the weeks of non-hearsay evidence admitted against all defendants on wage embezzlement, Bank of Labor fraud, health-care fraud, pension fraud, and vacation-pay embezzlement, none of which had any relevance to the international travel counts against Larry McManamon.

Brian Opland's testimony illustrates the concern in stark terms. Mr. Opland – the only non-officer IBB member the government called at trial – was presented as the face and voice of the victimized rank-and-file Boilermaker. He testified in detail about President Jones's and Mr. Creeden's spending and their conduct at the 2016 convention. The government's direct examination introduced Mr. McManamon's name into that narrative by grouping him with Jones and Creeden in a series of leading questions about "the international leadership" who were misusing dues money. When defense counsel took Mr. Opland on cross, however, that framing collapsed.

On cross, Mr. Opland conceded he had never encouraged anyone to run against Mr. McManamon (unlike Mr. Jones), that Mr. McManamon had no opponent in the 2016 election Mr. Opland complained about, and – critically – that he did not know Mr. McManamon at all:

> Q. Do you know Larry McManamon?
> A. No.
> Q. Have you ever talked to Larry McManamon?
> A. No. If I have, it would maybe be a hello or something like that.
> Q. Would you recognize to see him?
> A. No.

Tr. 3289:15-21 (Vol. 14 - May 21, 2026). Cross also exposed that Mr. Opland had no personal knowledge that Mr. McManamon ever received the document the government had just walked him through on direct – that the government, not Mr. Opland, had inserted Mr. McManamon's name into the exchange. *Id.* at 3291:19-24 ("Do you have any personal knowledge that Mr. McManamon ever got this document? A. I – I'm not – I don't know. How would I know? … I'm not even listed on here."); *id.* at 3292:9-13 ("you didn't volunteer the name, the government did").

Undeterred by that admission, the government returned on redirect and put Mr. McManamon's name back in front of the jury alongside the other three racketeering co-defendants:

> Q. We – we started earlier about your gripes, concerns, grievances, with the way that the international leadership, being Newton Jones, William Creeden, Lawrence McManamon, and Kate Jones were spending your dues money. Kate Jones, Larry McManamon, Bill Creeden, Newton Jones, do they represent the Brotherhood that you joined?
>
> A. No.

Tr. 3296:11-17 (Vol. 14 - May 21, 2026) (Wamble redirect). Defense counsel had to make the government's omission explicit on recross: the redirect had "forgot[ten] to mention a couple names" – Mr. Fultz and Mr. Baca, two IVPs still serving as leaders of the same union whom the

government has not charged. *Id.* at 3298:10-19 (Spellacy recross). Recross also drew out the arithmetic the redirect had obscured: there are five IVPs, it takes 50 percent plus one to carry a vote, and "Larry McManamon can't do that by himself." *Id.* at 3299:1-7.

That line of questioning by the government that lumped Larry McManamon – and only Larrry McManamon of the 5 IVPs – into the mix with Mr. Jones and Mr. Creedend as greedy racketeers who did not represent the “the Brotherhood that (Brian Opland) joined” was permitted for one reason and one reason only: Mr. McManamon was, at that moment, still a defendant in the RICO conspiracy count. With that racketeering conspiracy label in place, the government was free to group him with Jones and Creeden in eliciting testimony from a rank-and-file witness about wide-spread theft and mismanagement − regardless of whether the witness knew Mr. McManamon or had any facts specific to Mr. McManamon. Count 1 is now gone under Rule 29. The count-specific mens rea inquiry Rule 29(b) requires the court to conduct on Counts 11, 20, and 21 is fixed to the government's actual proof about Mr. McManamon on the three charged trips − not to the conspiracy-adjacent framing that the presence of Count 1 in the trial permitted.

The court's own Memorandum Opinion invokes exactly the *Kotteakos* concern: courts must "be particularly vigilant when the government seeks to bring many individuals under the umbrella of a single conspiracy" because "[t]he risk is that a jury will be so overwhelmed with evidence of wrongdoing by other alleged coconspirators that it will fail to differentiate among particular defendants." Doc. 494 at 19 (quoting *Evans*, 970 F.2d at 674 and *Kotteakos*, 328 U.S. at 772). That vigilance is what Rule 29(b) requires the court to exercise now, on the government's case-in-chief record, without the distortion of the composite verdict.

## V. Count-by-Count Observations.

The government's element-by-element sufficiency discussion adds nothing count-specific to what the court has already reviewed. A few responses in kind, keyed to the record the government identifies:

### A. Count 11 – London / TSSA Strategic Partnership (Jan. 31 – Feb. 10, 2020).

The government cites Brown's testimony that TSSA was smaller than the IBB, that meetings with TSSA officials were brief, and that the group stayed in London for days after the meetings concluded. Doc. 502 at 15. None of that is count-specific evidence of Mr. McManamon's intent. It is evidence about the delegation. The court has already credited the government's evidence that Mr. McManamon returned on the assigned date. Doc. 494 at 9 (crediting Gov't Ex. 311c, 311h, 311i; Def. Ex. 2981). The signed TSSA Strategic Partnership Agreement (Ex. 116) demonstrates that the engagement produced a substantive union deliverable. And Brown's acknowledgment on cross that the initiative was his own – Tr. 1583:23 (Vol. 8 - May 13, 2026) – is the government's own witness conceding that the TSSA work was real union work. No rational juror, on the government's case-in-chief record, could conclude beyond a reasonable doubt that Mr. McManamon attended the TSSA trip with the specific intent to disobey the law and without a good-faith belief that the expenditure served the IBB. Jury Instr. Nos. 17, 29, 42.

### B. Count 20 – Italy / FLAEI Conference (Apr. 8 – May 2, 2022).

The government's Count 20 argument rests almost entirely on itinerary and delegation evidence – early arrival, "open" days, tour days, group activities scheduled by others. Doc. 502 at 8-9. As the court has already held, that evidence describes what the delegation did together; it does not attribute a specific improper expenditure or a specific improper intent to Mr. McManamon. Doc. 494 at 8, 10. The government's own count-specific summary (Ex. 320b) shows Mr. McManamon

accounting for approximately four percent of the total spend on this trip − with no premium excursion, no lavish personal expense, and no false reimbursement. The government offers no evidence that the FLAEI Convention did not occur, that the assignment was not made, or that Mr. McManamon declined the assigned work while he was there.

The government also relies on prior Italy trips as 404(b) evidence of intent. Doc. 502 at 13-14. The court admitted that evidence for the limited 404(b) purpose. But prior assigned trips share the same characteristic as the charged trip: assigned attendance. "Repeated travel to Italy, paid for by the Boilermakers," Doc. 502 at 14, at the direction of the International President is not a pattern of criminal willfulness; it is a pattern of complying with assignments. Rule 404(b) evidence cannot elevate assigned attendance to specific intent to embezzle any more than direct evidence can. See Doc. 494 at 8 ("[a]ll the evidence indicates is that Mr. McManamon attended the trips assigned to him and completed the work he was assigned while he attended").

**C. Count 21 – York / Sheffield / TSSA 125th Anniversary (May 6–11, 2022).**

Count 21 is a continuation of the same TSSA engagement that underlies Count 11. The 125th-anniversary event was a real event on TSSA's calendar. The assignment letter is in evidence as Exhibit 321a. Brown, again, could identify no document reflecting any specific improper McManamon expense on the trip. Tr. 1585:4-1586:21 (Vol. 8 - May 13, 2026). Ms. Stapp, again, testified that Mr. McManamon attended the meetings he was assigned to and was otherwise on business calls. Tr. 2077:13-15; 2078:19-21 (Vol. 10 - May 15, 2026). And the government's own case agent again acknowledged the parallel with other, uncharged IVPs. Tr. 2854:25 (Vol. 12 - May 19, 2026). The analysis is the same as Count 11, and the result is the same.

## VI. Conclusion.

The guilty verdicts against Larry McManamon on Counts 11, 20 and 21 cannot rationally stand. The court should enter judgments of acquittal on Counts 11, 20, and 21.

Respectfully submitted,

**Branden Smith #22761**
SMITH LEGAL, L.L.C.
719 Massachusetts Street, Suite 126
P.O. Box 1034
Lawrence, Kansas 66044
(785) 856-0780 P
(785) 856-0782 F
branden@smithlegalllc.com

Kevin M. Spellacy, *pro hac vice*
James Wooley, *pro hac vice*
Erin E. Hanson, *pro hac vice*

ATTORNEYS FOR DEFENDANT
LAWRENCE McMANAMON

**CERTIFICATE OF SERVICE**

I hereby certify that on the 10th day of August, 2026, a true and correct copy of the above and foregoing was electronically filed with the Clerk of the Court by using the CM/ECF that will send a notice of electronic filing and access to the document to all counsel of record.

By,

**Branden Smith #22761**